**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| JAY ESCOBALES; HIS MINOR CHILDREN JOSEPH A. ESCOBALES ALBINO; ALITZA MARIE ESCOBALES ALBINO; JAY ESCOBALES SOTO; and JOREL A. ESCOBALES SOTO | CIVIL CASE NO. |
| Plaintiffs | RE: TORTS |
| vs. | |
| THE UNITES STATES OF AMERICA**;** | |
| Defendants | |

**<u>COMPLAINT</u>**

**TO THE HONORABLE COURT:**

      **COMES NOW** the Plaintiffs, through the undersigned attorneys and very respectfully pleads and prays as follows:

### I.   <u>Introduction</u>

      This action arises from the negligent, unlawful and abusive conduct of federal authorities against Lieutenant Colonel Jay Escobales Jimenez (LTC Escobales), a decorated combat veteran, whose career, reputation, health and financial stability were irreparably damaged by an unsubstantiated investigation and negligent actions. Despite the absence of any formal charges or adverse findings, LTC Escobales was denied a fair process, subjected to negligent and unlawful actions, illegally prolonged administrative flagging, and reputational harm. Plaintiff seeks redress for these negligent and illegal violations, damages caused, emotional distress, and professional obstructions inflicted by the government's misconduct.

## II.   <u>Jurisdiction</u>

1.    The Court has jurisdiction in this matter as the United States is a party, under Article III, Section 2, Clause 1 of the Constitution and under 28 USC §1346 (b) for claims arising under the Federal Tort Claims Act for personal injury.

2.    Jurisdiction is proper under 28 USC §1346(b)(1) and §2401(b), as Plaintiff timely filed administrative claims with the FBI, DOJ, and Department of the Army, and received final agency responses and/or constructive denials.

3.    Venue is proper under 28 USC §1402(b), as the events giving rise to the claims occurred in Puerto Rico, and is also where Plaintiffs reside.

## III.   <u>Parties</u>

4.    Plaintiff LTC Escobales is a United States citizen and resident of Ponce, Puerto Rico. LTC Escobales holds the rank of Lieutenant Colonel in the United States Army in which he has served for the last 30 years. He is on full-time National Guard duty and is currently assigned as the Puerto Rico National Guard (PRNG) State Safety Officer. The State Safety Officer serves as the principal advisor to the Adjutant General (TAG) and the Joint Force Headquarters (JFHQ) leadership on all matters relating to safety and occupational health.

5.    Plaintiff Joseph A. Escobales Albino is a U.S. citizen, currently residing in Fort Steward, Georgia, United States and is one of LTC Escobales' sons.

6.    Plaintiff Alitza Marie Escobales Albino is a U.S. citizen and resident of Ponce, Puerto Rico and is the daughter of LTC Escobales.

7.    Plaintiff Jay A. Escobales Soto is a U.S. citizen and resident of Ponce, Puerto Rico and is one of LTC Escobales' sons.

8.      Plaintiff Jorel A. Escobales Soto is a U.S. citizen and resident of Ponce, Puerto Rico and is one of LTC Escobales' sons.

9.      Defendant United States of America is sued under the FTCA for the acts and omissions of its agents and employees acting within the scope of their employment, including agents/employees of the Federal Bureau of Investigation (FBI), Department of Justice (DOJ), and Department of Defense (DoD).

10.     The Federal Bureau of Investigations is the domestic intelligence and security service of the United States, and it is a principal federal law enforcement agency, operating under the United States Department of Justice. The agents referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the Federal Agencies listed herein. Further, the agents referenced in this Complaint are "investigative or law enforcement officer" within the meaning of 28 U.S.C. §2680(h), and thus, a claim for malicious prosecution may be pursued against the U.S.

11.     The Department of Defense is an executive branch department of the federal government charged with coordinating and supervising all agencies and functions of the government directly related to national security and the United States Armed Forces. The National Guard is a state-based military force that becomes part of the reserve components of the United States Army when activated for federal missions. The agents referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the Federal Agencies listed herein. Further, the agents referenced in this Complaint are "investigative or law enforcement officer" within the meaning of 28 U.S.C. §2680(h), and thus, a claim for malicious prosecution may be pursued against the U.S.

12.    Fictitious Defendants ABC Company, John Doe, Richard Roe, Jane Doe, are all entities, agencies, government branches or individuals who contributed to or participated in or authorized the acts or collaborated with the named Defendants to commit negligent acts which caused the harm, injuries and damages to the Plaintiffs as hereinafter described. Each of said named fictitious parties, acted as principal and agent, each of the other, and combined and concurred with the other in committing the acts that injured the Plaintiffs herein and are liable jointly and severally with the other co-defendants for the claims alleged in this Complaint.

### IV.    <u>Exhaustion of Administrative Remedies</u>

13.    Plaintiff submitted Standard Form 95 (SF95) to the FBI, DOJ, and Department of the Army, detailing the negligent acts that had been committed against him, providing said agencies with sufficient information to investigate the claims and the amount of damages sought.

14.    By way of letter dated May 13, 2025, the DOJ/FBI issued a letter denying Plaintiffs' Administrative Claim.

15.    The other named agencies failed to resolve the claims within six months, constituting a constructive denial under 28 USC § 2675(a).

### V.    <u>Factual Allegations</u>

16.    On January 25, 1996, LTC Escobales entered the U.S. Army, as an enlisted man.

17.    Through hard honest work and an excellent record, his military acumen was recognized and his commander recommended him for Officer Candidate School.

18.    On August 25, 2001, LTC Escobales was commissioned as a Second Lieutenant.

19.    In the United States Army an officer advances in rank by submitting to a review board, after satisfying time in current rank and other qualification requirements.

20.     In this process the candidate competes for promotion against all other qualified candidates on a national level. A board can be held either by local or stateside commands. An officer qualifying for promotion can either be promoted or passed over, at the board's recommendation.

21.     If an officer is passed over and not selected for promotion, he can compete on the next year's round of boards, up to a total of two times. If the officer is passed over on all three attempts, he is required to retire.

22.     As expected, LTC Escobales advanced through the ranks.

23.     All his review boards (Department of the Army Boards) for advancement in rank from lieutenant all the way to Lieutenant Colonel were conducted by officers on stateside commands.

24.     At all times, he was recommended to advance to the next rank at the first board appearance.

25.     On or about February 2017, the Department of Justice (FBI) and the Department of Defense, began an investigation for alleged unusual political activities within the Puerto Rico Army National Guard.

26.     On or about March of 2019, FBI special agents and Defense Criminal Investigative Service agents ("the agents") summoned LTC Escobales via telephone to be interviewed.

27.     The interview was to be conducted at a Denny's Restaurant, in Ponce, Puerto Rico, city in which LTC Escobales resides.

28.     During the call, LTC Escobales advised the agents that at that time he was under the effects of prescribed anxiety medication and would prefer holding the meeting some other day.

29.     Despite LTC Escobales' reasonable request, the agents insisted on conducting the interview that day.

30.     The agents stated that the interview would be a friendly one, advising him that there was no need to consult or have a lawyer present to avoid complicating things.

31.     During this interview LTC Escobales was interrogated about the practice of supporting political candidates.

32.     At all times during the interrogation, LTC Escobales advised that he had not done anything wrong.

33.     After the conclusion of said interview/interrogation process, which occurred in March 2019, LTC Escobales was not questioned or approached in any manner by either civilian or military authorities until September 24, 2020.

34.     On that day, September 24, 2020, the FBI executed a search warrant on LTC Escobales' residence with excessive force.

35.     LTC Escobales lives in Estancias del Golf, a gated residential community located in Ponce PR.

36.     The search warrant was executed by over twenty-eight (28) agents, of which fifteen (15) were in full tactical gear with displayed automatic weapons, negotiators, a bomb squad, over eight (8) SUV vehicles carrying agents, an evidence recovery team, and an armored tank-like tactical vehicle.

37.     In a television interview in El Cuarto Poder, FBI special agent Joseph Gonzalez (in charge of the San Juan Field Office at that time), described the tactical vehicle that was used as "a tank", to be deployed in the highest risk situations.

38.    While executing the search warrant, the FBI agents specifically targeted and destroyed all of LTC Escobales' home security cameras, threw eleven (11) flash-bang grenades into the house, including two in the area where his dog was. They also destroyed LTC Escobales' house door.

39.    All of these unnecessary, abusive and excessive actions during the execution of the warrant were conducted in an empty house because LTC Escobales was not at his residence at that time.

40.    No agent or government personnel contacted LTC Escobales before or during the warrant execution.

41.    LTC Escobales found out about these unnecessary, unfortunate and deplorable developments by a neighbor's call.

42.    Although federal agents seized money and electronic equipment from LTC Escobales' home, it was surprising to learn that the government did not seize a single firearm (three guns and a shotgun, properly registered with the Puerto Rico Police), all of which were inside his bedroom.

43.    The abusive and exaggerated way that the search warrant was executed received extensive publicity by the major news channels and newspapers.

44.    The FBI also issued a press release regarding said search warrant.

45.    Videos of the excessive force during the warrant execution went viral nationwide through various social media platforms.

46.    On September 16, 2021, that is, one (1) year after the warrant execution incident and more than two (2) years after the Denny's interview, two (2) FBI agents visited LTC Escobales' immediate commanding officer at that time, Colonel Haynet Llovet.

47.    These FBI agents questioned COL Llovet as to why LTC Escobales was not flagged in the Army's system. It bears noting that COL Llovet is an attorney and that she questioned the FBI agents because at the time of their visit there was no document in the National Guard specifying that LTC Escobales was under investigation. The next day, the FBI sent a one-page letter staating that LTC Escobales was a possible subject of interest in a conspiracy for the sale of positions. This would be absurd since the personnel hiring process in the PRNG is done through a Board, where the panelists analyze the candidates who applied to the published position. The panelists are not identified until the day the Board is held. They are summoned to the Human Resources Office (HRO) and briefed on why they are there with the details. In addition, HRO vets the applicants' packages before the Board to see who qualifies for the positions.

48.    Due to the FBI's agents illegal, negligent and tortious actions, LTC Escobales was flagged on September 21, 2021.

49.    It is significant to note that the Army's flag action does not fall within the FBI's jurisdiction.

50.    It is also important to note that the Army's flag action had no bearing on the FBI's investigation.

51.    Stated differently, whether LTC Escobales was flagged or not, that did not affect in any way, shape or form, any investigation the FBI may have been conducting.

52.    A flag action is an administrative act, identifying a member of the military as someone undergoing disciplinary or administrative action.

53.    The practical effect of a flagging action is that the officer's career is stopped in place, insofar as he is suspended from receiving favorable actions, including but not limited to, attending schools or training required for career development, nor allowed promotions or awards.

54.     In this specific case, and as a direct result of the flagging action wrongfully instigated by the FBI's agents, LTC Escobales was not allowed to apply to the United States Army War College, or any other military school, denying him indispensable opportunities for the progression of his career.

55.     Above all, flagging actions are not supposed to be used as punishment, rather they serve as an administrative placeholder while the final disposition of disciplinary or other adverse action is pending.

56.     Flags must be reviewed at least monthly, and battalion-level commanders are required to conduct a monthly review of all flags older than six (6) months.

57.     As previously mentioned, LTC Escobales was placed at a disadvantage on this continuation board insofar as he was unable to take the required military schooling, which occurred as a direct consequence of the negligent flag action.

58.     Specifically, on April 2022, LTC Escobales was unable to apply for Senior Service College, once again, as a repercussion of being illegally or wrongfully flagged.

59.     The National Guard does not provide a direct administrative process by which a member who has been flagged can challenge the same.

60.     The member is at the absolute discretion of his commanding officer.

61.     Despite this, LTC Escobales exhausted all the limited administrative petitioning processes to have the flagging action removed.

62.     By way of example, on February 2022, LTC Escobales wrote to the National Guard Bureau Senior Inspector General, Dr. Hummel, Laurel J., which is the highest level on the National Guard organization inspector general branch, to request help with his situation.

63.    Dr. Hummel wrote back to LTC Escobales downgrading the situation to the Puerto Rico National Guard Inspector General.

64.    On February 2023, LTC Escobales wrote an email to the PRNG IG, Col Angel Feliciano, explaining the situation and asking for interpretation and advice. Col Angel Feliciano replied to the email informing LTC Escobales that he must go to the PRNG IG for the correct process.

65.    On March 2023 LTC Escobales also wrote to Brigadier General Miguel Mendez seeking help.

66.    Although LTC Escobales explained the situation in great detail, BG Mendez never provided a response.

67.    As instructed, on March 2023, LTC Escobales brought the situation before the Puerto Rico National Guard Inspector General (PRNG IG).

68.    After weeks of investigation by the PRNG IG personnel, LTC Escobales was informed that serious violations against him were committed during the administrative process, but that he was to remain flagged insofar as the Defendant DOJ purportedly still had an open investigation.

69.    By April 2023, LTC Escobales was, yet again, unable to apply to Senior Service College as a repercussion of being illegally or wrongfully flagged.

70.    During this process, LTC Escobales also requested the appointment of a military attorney.

71.    Said petition was turned down, as the flagging action was, supposedly, not a "punitive action", despite the uncontroverted fact that it has had, enormous punitive consequences.

10

72.    Attempting to seek resolution, LTC Escobales also made repeated requests to his commanders that the flagging action be lifted from his file, or in the alternative, that he be charged (in civilian or military tribunal) with any violation that any evidence in possession of the Government would support, as such a charge would at the very least allow him to confront the purported charges directly.

73.    LTC Escobales was never charged, nor was he provided any forum to challenge the actions that were wrongfully and negligently instigated by the FBI agents.

74.    Furthermore, on October 10, 2023, two (2) Criminal Investigation Division (CID) agents went to LTC Escobales' former Battalion 1-296 INF BN at Mayagüez, asking questions about him.

75.    MAJ Roberto Rivera 1-296 INF BN executive officer contacted COL Willian O'Connor to inform the situation.

76.    COL O'Connor instructed MAJ Rivera to allow the CID agents to conduct the questioning, once again humiliating and degrading LTC Escobales' reputation. It is important to note that at this juncture, twenty-two (22) months had transpired after the investigation was supposed to be closed by the statute of limitations.

77.    Also important to note is that the CID has no jurisdiction on this subject since LTC Escobales is not Title 10, but rather under Title 32 code, which the DCIS and CID have no jurisdiction.

78.    It was not until October 13, 2023, that DCIS agent Sheila Kyle contacted COL O'Connor to inform him that the US Attorney's Office declined to prosecute a case against LTC Escobales.

79.    The reason DCIS Special Agent Sheila Kyle gave COL O'Connor was that the statute of limitations on the potential crimes that he might have committed had elapsed.

80.    Since there was no substantiated or adverse information regarding civilian law enforcement investigation against LTC Escobales, deflagging was recommended. This was put in writing in an email dated October 14, 2023. It is important to note that all these actions were initiated by my commander, LTC German Muñiz, who contacted Agent Kyle. She responded that the investigation was still active. This prompted Agent Kyle to take the necessary measures to update the information regarding LTC Escobales' investigation, thereby enabling her to ascertain through the FBI/DOJ that the investigation had been closed.

81.    This only proves that Defendants acted negligently while destroying LTC Escobales' career, family, reputation, and mental health.

82.    While there is no specific information as to why the FBI had been involved in the initial interview of LTC Escobales or in further inquiries into his status, it is assumed that it is under a 1984 Memorandum of Understanding between the Department of Defense and the Department of Justice.

83.    This MOU is discussed in DoD Instruction 5525.07, Implementation of the Memorandum of Understanding Between the Departments of Justice and Defense Relating to the Investigation and Prosecution of Certain Crimes, effective March 5, 2020. In its pertinent part the Memo reads as follows:

4.    **DEPARTMENT OF JUSTICE NOTIFICATIONS TO DEPARTMENT OF DEFENSE INVESTIGATIVE AGENCIES**

**a.** The Department of Justice investigative agencies will promptly notify the appropriate Department of Defense investigative agency of the initiation of the Department of Defense related investigations which are predicated on other than a Department of Defense referral except in those rare instances where notification might endanger agents or adversely

affect the investigation. The Department of Justice investigative agencies will also notify the Department of Defense of all allegations of the Department of Defense related crimes where investigation is not initiated by the Department of Justice.

**b.** Upon request, the Department of Justice investigative agencies will provide timely status reports on all investigations relating to the Department of Defense unless the circumstances indicate such reporting would be inappropriate.

**c.** The Department of Justice investigative agencies will promptly furnish investigative results at the conclusion of an investigation and advise as to the nature of judicial action, if any, taken or contemplated.

84.    The above referenced email of October 14, 2023, is telling for two reasons.

85.    First, the MOU establishes the clear duty of diligence, something severely lacking in this case.

86.    The second is the statement that "[t]here is no substantiated or adverse information regarding the civilian law enforcement investigation".

87.    Agent Kyle is not stating that there were facts that support criminal infraction which could not be prosecuted due to the tolling of the statute. Rather, the agent is stating that there is no substantiated or adverse information.

88.    One of the most fundamental aspects is timely actions in the investigative and administrative procedures, by stating "… It is important to complete investigations, administrative actions, and prosecutions in a timely manner notwithstanding a lengthier statute of limitations."

89.    From this analysis, it is clear that the only reason that LTC Escobales was placed under flagging action was to place him under absolute pressure, to the point of destroying a stellar military career, to try to force him with the FBI in an investigation that had no supporting evidence.

90.    That type of negligent action is, of course, illegal, unjust, and abusive over one of its citizen-soldiers, particularly over a distinguished combat veteran.

91.     By the negligent acts and lack of prompt actions on part of the FBI and the Army, LTC Escobales spent more than two (2) years flagged for an uncorroborated investigation and illegal and negligent actions of FBI agents.

92.     It must be noted that more than six (6) years passed since the beginning of Defendants' purported investigation, which began in February 2017 in the Puerto Rican National Guard, and not a single person was charged, including LTC Escobales, nor was any superior officer to LTC Escobales flagged.

93.     It should be further noted that LTC Escobales was the only member of the National Guard flagged as a result of the FBI's purported "investigation".

94.     Despite all this, LTC Escobales made further attempts to continue his career. However, Defendants' negligent actions that led to the flagging action, as well as other administrative mishaps rendered his attempts futile.

95.     On March 2024 LTC Escobales was informed that he could not be promoted, positioning him at an unjust disadvantage against his peers.

96.     Particularly, LTC Escobales was informed that he would participate in a continuation board in June 2024, which would determine whether he possessed the necessary qualifications to remain in the AGR program.

97.     In August 2024, twenty months before reaching his 20 years of service, LTC Escobales was notified that he had not been selected to continue in the AGR program.

98.     Additionally, in December 2024, LTC Escobales went before the DA Board for the first time to be considered for promotion.

99.     In May 2025, LTC Escobales was informed that, for the first time in his career, he had not been selected for promotion to the rank of Colonel. As mentioned, this entire process

placed LTC Escobales at an utter disadvantage, costing him both his position and his opportunity for advancement.

100.    During this period of time, the damages suffered by LTC Escobales became concrete, real and apparent.

101.    LTC Escobales hereby seeks redress for all damages suffered as a result of Defendants' negligent, tortious and illegal actions and omissions.

VI.    **Causes Of Action**

**A.  Federal Torts Claims Act**

102.     Plaintiffs incorporate by reference all allegations set forth above.

103.    The acts and events set forth above constitute negligent, wrongful and illegal acts and omissions of agents and employees of the U.S. Government, *inter alia*, negligent investigation, abuse of process, infliction of emotional distress and interference with a prospective economic opportunity while acting within the scope of their offices and employment, under circumstances where the Defendant U.S., if a private person, would be liable to the Plaintiff in accordance with the laws of Puerto Rico.

**B.  Violation of 28 U.S.C. §2680 (h)**

104.    Plaintiffs incorporate by reference all allegations set forth above.

105.    The acts and events set forth above constitute negligent, wrongful and illegal acts and omissions of agents and employees of the U.S. Government, *inter alia*, negligent investigation, abuse of process, infliction of emotional distress and interference with a prospective economic opportunity while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiff in accordance with the laws of Puerto Rico.

### C.  Tortious Interference with Career and Reputation

106.     Plaintiffs incorporate by reference all allegations set forth above.

107.     Defendants unlawfully and negligently interfered with Plaintiff's military career by instigating a flagging action without substantiated evidence or even jurisdiction.

108.     The illegal flagging action caused LTC Escobales loss of promotions, denial of military schooling, reputational damage within the military and civilian community, and eventual loss of career.

### D.  Negligence

109.     Plaintiffs incorporate by reference all allegations set forth above.

110.     The agents referenced in this Complaint were at all relevant times employees of the United States, acting within the scope and course of their employment with the Federal Agencies listed herein, under circumstances where the United States, if a private person, would be liable to the Plaintiff in accordance with the laws of Puerto Rico. 28 USC §1346(b).

111.     Article 1536 of the Puerto Rico Civil Code, establishes a cause of action for damages caused by fault or negligence.

112.     Plaintiffs must prove three elements: (1) a negligent act or omission, (2) damages, and (3) a causal relationship between them.

113.     Defendants' negligence includes, but is not limited to, negligent investigation, abuse of process, infliction of emotional distress, damage to reputation, and interference with economic opportunity.

114.     Through the negligent acts and omissions referenced in this Complaint, Defendants have caused and continue to cause substantial damages to Plaintiffs.

115.    If not for the illegal, negligent and tortious flagging action, LTC Escobales would have had the opportunity to take the required courses to be competitive among his peers and continue advancement of his career as he had done so in the past.

116.    Also, the negligent actions and omissions of LTC Escobales' commanding officer left him illegally and negligently flagged for over two (2) years.

117.    The damages suffered by LTC Escobales are continuing, that is those produced by one or more culpable or negligent acts attributable to the actor, contemporary or not, which result in uninterrupted, sustained, lasting, uninterrupted harmful consequences, linked to each other, which when known make it also known due to being foreseeable the continuous and uninterrupted nature of its effects, becoming at that moment certain damage made up of elements of current damage (that which has already occurred) and foreseeable and therefore certain future damage, as defined in Rivera Prudencio v. Municipio de San Juan, 170 DPR 149, 167 (2007).

**E.  Damages**

118.    LTC Escobales has suffered extensive damage as a result of Defendants' negligent, tortious and illegal actions.

119.    LTC Escobales has suffered, currently suffers, and will continue to suffer economical, emotional and physical damage caused by the way the Defendants illegally, negligently and improperly destroyed his military career.

120.    LTC Escobales now suffers from insomnia, hypervigilance, general anxiety, and depression.

121.    As a result of Defendants' illegal, tortious and negligent actions, LTC Escobales has also developed panic attacks, agoraphobia, social anxiety disorder, intestinal and colon problems, heart conditions, erectile problems, eating disorder, and multiples medical absences, all

caused by this afore-referenced negligent actions and abusive process. Additionally, due to Defendants' illegal, tortious and negligent actions LTC Escobales has been hospitalized in mental institutions multiple times, the most recent being in March 2025, for two weeks due to the impact on his mental health that these legal, financial, work-related problems have brought into his life, now depending on over 4 medications to be able to function to a certain extent.

122.    Further, LTC Escobales' children have suffered extensively. They are hypervigilant, scared, and distracted in school.

123.    They have also developed anger issues and even gotten into fights defending their father.

124.    LTC Escobales' daughter had to finish high school in a private course.

125.    His relationship with his children has suffered substantially, causing further anguish to all involved.

126.    LTC Escobales even fears having his children over to his house, afraid that another illegal and negligent government intervention might further injure them. As a result, LTC Escobales has minimized spending time with his kids to prevent any unfortunate situation or endanger them of any kind of attack.

127.    Furthermore, LTC Escobales' reputation has suffered extensively.

128.    Before the government's illegal and negligent actions LTC Escobales was a respected member of the community, a highly decorated combat veteran and had a stellar military career.

129.    As a direct result of Defendants' abusive, negligent and illegal actions, LTC Escobales' reputation within his community is that of a person for whom an armored vehicle was needed to go to his house and is seen as a criminal and a menace to society.

130.    LTC Escobales' reputation within the military community has also suffered extensive damage.

131.    As a result of the flagging action, wrongfully instigated by the FBI, LTC Escobales was denied all advancement options.

132.    As a direct result of all this illegal, negligent and entirely unnecessary process, LTC Escobales was also forced to file bankruptcy due to the financial instability this entire situation created.

133.    This directly impacted his security clearance, raising continuous interventions by the Department of National Security, Army and National Guard. Additionally, this has caused LTC Escobales to send continuous reports on his bankruptcy status to higher command, creating a continuous burden upon him. Furthermore, as a direct result of this injustice, LTC Escobales' employment will end following the panel's meeting and its decision not to select him to continue in the program. The notification stated: "After careful review of your record, unfortunately you have not been selected to continue in the Active Guard Reserve program." Additionally, and as a direct consequence, LTC Escobales was not selected for promotion, having faced a clear disadvantage before the DA Board—resulting in the first passover of his career.

134.    Particularly, LTC Escobales' employment will now end on March 2026. As an Officer, LTC Escobales' Mandatory Removal Date (MRD) was August 2029 or, had he been selected for promotion to Full Bird Colonel, it would have been extended for two more years, that is, until August 2031. As such, Defendants' actions (as it pertains to employment only) cut short 4 to 6 years of LTC Escobales' work at a minimum rate of $192,000,00 annually.

135.    After twenty-five (25) years of being an officer for the Army, the government's illegal and negligent actions have also caused a financial crisis upon LTC Escobales, with two (2) of his children beginning college and another one still in high school.

## VII.    <u>Remedy Requested</u>

This Court has the authority to order Defendant, the United States, to make LTC Escobales whole, by ordering monetary damages in the amount of ten and a half million dollars (10,500,000.00), plus additional damages as determined by the jury.

In view of the above, it is requested that this Honorable Court order the United States to:

A. Grant Plaintiffs all the sums requested in the Complaint;

B. Impose upon Defendants the payment of all costs and expenses to be incurred in this lawsuit;

C. Award Plaintiffs pre-judgment and post-judgment interest, plus a reasonable amount for attorneys' fees;

D. Provide such other and further relief as may be just and proper;

E. Plaintiffs demand trial by jury in this action.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 4th day of November, 2025.

*s/Juan Carlos Deliz*
**JUAN CARLOS DELIZ**
USDCPR # 224702

DELIZ LEGAL LLC
Monte Tower, Suite 502
650 Muñoz Rivera Ave.
San Juan, P.R. 00918

TEL: (787) 567-5192
Email: jcdeliz@delizlegal.com